| | | |
|---|---|---|
| BETTY YODHES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Cause No. 1:16-cv-2803-WTL-MJD** |
| | ) | |
| AMERICAN UNITED LIFE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the motion for summary judgment filed by Defendant American United Life Insurance Company ("AUL") (Dkt. No. 46). The motion is fully briefed and the Court, being duly advised, **GRANTS** the motion for the reasons set forth below.

## I.      SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the properly supported evidence presented by the non-moving party must be believed, and all reasonable inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, a party who bears the burden of proof on a particular issue may not rest on its pleadings, but must show what evidence it has that there is a genuine issue of material fact that requires trial. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour

the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

This Court's Local Rule 56-1(f) provides:

**(f) Court's Assumptions About Facts.** In deciding a summary judgment motion, the court will assume that: **(1)** the facts as claimed and supported by admissible evidence by the movant are admitted without controversy except to the extent that:

**(A)** the non-movant specifically controverts the facts in that party's "Statement of Material Facts in Dispute" with admissible evidence; or

**(B)** it is shown that the movant's facts are not supported by admissible evidence; or

**(C)** the facts, alone or in conjunction with other admissible evidence, allow the court to draw reasonable inferences in the non-movant's favor sufficient to preclude summary judgment.

**(2)** facts that a non-movant asserts are true to the extent admissible evidence supports them.

## II.    BACKGROUND

As noted above, the Court must consider the properly supported facts of record in the light most favorable to Plaintiff Betty Yodhes, the non-moving party. The only evidence Yodhes points to in her brief in opposition to the instant motion is her own affidavit. AUL argues that many (24) of the facts asserted by Yodhes in her Statement of Material Facts in Dispute are not properly supported and must not be considered by the Court because, while they appear in Yodhes' affidavit, they contradict or are inconsistent with her deposition testimony.

The rule in this circuit is clear:

"As a general rule . . . this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony." *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996); *see also Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996) ("We have long followed the rule that parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions."). Thus, where deposition testimony and an affidavit conflict, "the

> affidavit is to be disregarded unless it is demonstrable that the statement in the
> deposition was mistaken, perhaps because the question was phrased in a confusing
> manner or because a lapse of memory is in the circumstances a plausible
> explanation for the discrepancy." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68
> (7th Cir. 1995). In the alternative, supplemental affidavits can be employed "to
> clarify ambiguous or confusing deposition testimony." *Buckner*, 75 F.3d at 292.

*Dunn v. Menard, Inc.*, 880 F.3d 899, 910-11 (7th Cir. 2018). Therefore, where the difference between Yodhes' deposition testimony and affidavit, as asserted by AUL, could be material to the Court's decision, the Court has addressed below AUL's assertion that the statement in the affidavit should be disregarded. Otherwise, the Court has simply omitted the fact or, if the fact serves to give context to Yodhes' argument, has included it in the recitation of facts below, forgoing, in the interests of judicial economy, an analysis of whether it should be excluded under the sham affidavit rule.

AUL is an insurance company headquartered in Indianapolis, Indiana. Yodhes began her employment with AUL in September 2014 as a Plan Manager in AUL's Plan Services-Trust Department. As a Plan Manager, Yodhes served clients who purchased retirement plans from AUL for the benefit of their employees. Her duties included anticipating and meeting clients' day-to-day needs, ensuring that client requests were timely addressed, and "just making sure the clients stayed happy." Dkt. No. 48-1 at 5.

Jeanne Goble, Manager of Plan Services-Trust, was Yodhes' direct supervisor. Assistant Vice President of Plan Services, Joe Miller, led the Plan Services Department and directly supervised Goble. Goble supervised both Plan Managers and Plan Services Consultants. Plan Managers and Plan Services Consultants perform the same basic job duties and are collectively referred to as Plan Managers. While Yodhes was employed, two female Plan Managers and one male Plan Manager separated from AUL, and four male Plan Managers were hired. The four newly hired males were Ed Spieth (October 24, 2014), David Engel (December 15, 2014), Ken

Pavnica (January 25, 2015), and John Peterson (February 2, 2015). Only Peterson reported directly to Goble. When Yodhes began, thirteen of eighteen Plan Managers were female. Just prior to Yodhes' resignation, twelve of nineteen Plan Managers were female. Of the Plan Managers who reported to Goble, half were male and half were female.

All the Plan Managers worked on different plans, which varied by number of participants and amount of assets. Each client's requirements were unique, with some requiring more communication, some requiring additional administrative tasks, some requiring faster turn-around times on assigned tasks, and some being easier to work with than others.

Shortly before her employment began, AUL provided Yodhes with online training materials, which AUL referred to as "Learning Links," that Yodhes was expected to review and complete during the first thirteen weeks of her employment. Yodhes reviewed only some of the materials and took just one of the Learning Links examinations.

It is Yodhes' opinion that, contrary to AUL's assertion that the Learning Links were intended to be a self-directed training program, in practice, employees—including Yodhes—required additional input and oversight by an experienced Plan Manager. In Yodhes' opinion, AUL did not provide Yodhes with the necessary support to complete the Learning Links. In addition, Yodhes believes that AUL did not give her sufficient time to complete the Learning Links sessions because she was assigned a full caseload approximately two weeks after she started working at AUL. AUL employed an outdated computer system and did not provide Yodhes with adequate training regarding how to operate the system, perform the complex data entry maneuvers necessary, or interface across several programs to find necessary information. AUL provided Yodhes with no training or guidance with respect to each client's particular needs or preferences, leaving her to try to learn that information through trial and error.

In addition to the Learning Links training, the Plan Services-Trust Department provided a mentorship program connecting new Plan Managers with more experienced Plan Managers who were designated as "subject matter experts."  Goble arranged for Yodhes to shadow eight Plan Managers during her first three weeks at AUL, to observe their day-to-day duties.  This permitted Yodhes to observe the subject matter experts as they worked on their own caseloads, but there was insufficient time for them to impart their expertise regarding the subject matters identified.[1]  Goble also held periodic (weekly or at least monthly) one-on-one sessions with Yodhes during which Yodhes could ask questions or get help with any critical matters.  Yodhes could also email Goble to ask questions.

On September 24, 2014, a Plan Manager named Jennifer Wallace unexpectedly left AUL.  When a Plan Manager leaves or transfers, the clients he or she serviced are assigned to other Plan Managers.  Rather than disperse Wallace's caseload among multiple Plan Managers, AUL opted to assign Wallace's entire caseload to Yodhes, even though she had only been on the job for about two weeks and had not yet been properly trained with respect to the use of AUL's computer system.  Goble believed that Yodhes' seventeen years of prior experience in the retirement services industry would help her in servicing Wallace's clients.

One of the clients Yodhes received from Wallace's caseload was MNS.  Ilan Amir, an AUL employee who served as the Relationship Manager for the MNS plan, advised Yodhes on how to best service the MNS plan to keep the client happy.  In conjunction with her work on the MNS plan, Yodhes was required to create agendas for calls with the client and send Outlook calendar appointments in order to schedule calls with client contacts.  Yodhes viewed these as secretarial duties.  The agendas were created with information in notes that Yodhes took during

_____

[1]The Court disagrees with AUL's assertion that this statement of fact contradicts Yodhes' deposition testimony on this topic.

calls with MNS. Wallace, who serviced the plan before Yodhes, also had to do these tasks. These tasks were not required by Goble, but rather by the client contacts for MNS. Yodhes spoke with some, but not all, of her fellow Plan Managers (both males and females) about creating agendas for calls, and they told her that their clients did not require that of them. Yodhes testified that she did not know whether other Plan Managers were required to send calendar appointments to schedule calls with clients.

Beginning around the end of September 2014, Yodhes noticed that Miller would stare at her breasts when he would talk to her. He made no effort to conceal what he was doing, often staring for long periods of time. This occurred between ten and twenty times throughout Yodhes' employment and became more pronounced and more frequent as time went on.

By late October 2014, Amir told Yodhes he was disappointed with her performance, as she was not handling the plan in the manner he had instructed. In mid-November 2014, AUL Client Account Executive, Ben Winecki, reached out to Goble and Miller to tell them that MNS had lost confidence in Yodhes because of her lack of attention to detail and poor communication practices and requested that the plan be reassigned. Yodhes asked to be removed from the MNS plan. Goble consulted with Mona Duncan, another Manager of Plan Services-Trust, and upon considering the plan assignment factors, decided to move the MNS plan to Naomi Miller, a long-time Plan Manager, and assign ten of Naomi Miller's plans to Yodhes. Unlike the MNS plan, which was fairly new to AUL, the ten plans were well-established, two sets of the plans had the same client contacts (thus reducing communication needs), and one of the plans had just one participant. At least six of the ten plans had lower asset values than the MNS plan.

In November 2014, AUL's Human Resources Department conducted focus group discussions with Plan Managers in the Department. Based on the recommendations from the focus groups, Goble revamped the training regimen. Beginning in mid-December 2014, training

for new and recent hires covered the same information provided in Learning Links, but was conducted in a group setting. Yodhes had not been provided with this type of formal training session when she was initially hired and was only invited to attend some of the sessions when they were offered to her new male coworkers.

Additionally, instead of relying solely on subject matter experts, it was decided that new and recent hires would be assigned an individual mentor to assist with challenges as they arose. Although individual mentoring was not rolled out to the team until January 22, 2015, Goble informed Yodhes on December 2, 2014, that Naomi Miller had been assigned as her mentor.[2]

In January 2015, Yodhes began to experience considerable pain and discomfort related to uterine fibroids. The condition required her to attend several medical appointments. She discussed her condition with Goble. As a result of her condition, Yodhes did not need a reduction in her overall workload. Rather, she simply needed to be able to work from home during those periods when her pain level was elevated or when she had doctor's appointments.

In late January 2015, a call between Yodhes and the contacts for the Diakon plan went poorly. Yodhes received an email from Marianne Link, AUL's relationship manager for Diakon, in which Link conveyed the client's statements that the call was not what they were expecting and not productive, their disappointment that Yodhes required more information to complete a census for Diakon, and Diakon's lack of confidence that its data would be correct after

---

[2]Yodhes, citing to her affidavit, states in her statement of disputed facts that "AUL did not assign Yodhes a mentor until after the new male Plan Managers were hired." Dkt. No. 51 at 3. However, Yodhes testified at her deposition that she was informed on December 2, 2015, that Naomi Miller had been assigned as her mentor, Dkt. No. 48-1 at 23, and the record is undisputed that only one of the male Plan Managers (Spieth, who had been hired in October) had been hired by that date. *See* Dkt. 53-1 at 4 (Yodhes agreeing with AUL's records regarding when her coworkers were hired).

processing. Link told Yodhes the client requested a call the next business day, February 2, 2015, to get answers to the questions Yodhes had been unprepared to answer during the prior call.

On February 2, Miller and Yodhes met in a conference room to discuss the Diakon call. Miller berated Yodhes angrily, pounding his fists on the table, making offensive gestures to her, and calling her names. Miller was so angry and out of control during this meeting that Yodhes feared for her safety. Although Yodhes estimated the meeting lasted more than an hour, the only thing she could recall Miller stating was that he was "all keyed up," which he stated repeatedly. She testified that Miller was very irate, that he pounded on the table three to five times during the meeting, that he had an "odd demeanor," looked "very explosive," and had a "very distinctive, dirty look" with "eyes flashing." Dkt. No. 48-1 at 34. Yodhes had seen Miller get angry before, but not to that level. This was the only time Yodhes saw Miller that angry.

On February 3, 2015, Goble and Miller met with Yodhes to counsel her about her performance.[3] During the meeting, Miller stated that Yodhes had a history of poor performance, slow response times, and failure to meet expectations. He said she lacked preparedness, that her poor performance in the call with Diakon had embarrassed him and made him look bad, and that Diakon's advisor had requested she be replaced. He also told her that while AUL gave her the tools to succeed and they wanted her to succeed, the clock was ticking. Yodhes took that to mean that another client incident would result in some kind of discipline.

_____

[3]In her affidavit, Yodhes states that Miller began to treat her "poorly" almost immediately after she started at AUL. This contradicts her deposition testimony that Miller's treatment of her changed after the February 3rd meeting and that prior to that he had behaved like "a normal person." Dkt. No. 48-1 at 40. Yodhes also states in her affidavit that Miller "routinely had angry outbursts" directed at Yodhes and other women in the department. Similarly, in her affidavit Yodhes states that she "observed women, including [Marie] Williams, crying after having been mistreated by Miller." Dkt. No. 51-1 at ¶ 25. At her deposition, however, Yodhes testified that she heard females crying in the restroom at work but she did not know their names. Dkt. No. 48-1 at 53. She did, however, know Marie Williams, as she identified her as a person who told her that Miller "had a problem with women." *Id.*

On February 11, 2015, Yodhes sent an email to Matt McKim, a human resources representative, complaining about Miller and describing the February 3rd meeting as "an impromptu verbal warning." Though she wrote that Miller "has difficulty maintaining good work communication relations with women," Dkt. No. 48-2 at 21, she did not provide any specific examples. She recited her displeasure about the fact that Miller spoke to her about her poor performance. She criticized his management style and concluded by stating that Miller and Goble had "put me in an impossible situation and now they are trying to drive me out of the department." *Id.* at 23.

On February 12, 2015, the client contact for another of Yodhes' plans, MPI Corp., complained to AUL Client Service Manager Bradley Coomer about Yodhes. The client stated they were having difficulty working with Yodhes, and they had discovered the census data Yodhes sent them was incorrect, causing them to lose confidence that anything Yodhes sent them would be correct.

On February 16, 2015, Yodhes sent some long-awaited information to Diakon and its advisor about AUL's plan life cycle timeline. After the advisor, Tom Muldoon, emailed Miller to express his disappointment with what Yodhes had sent, Miller responded that he was going to replace Yodhes with another Plan Manager who had more experience, was a more confident communicator, and possessed better organizational skills. That same day, the client contacts for The Egg plan contacted Yodhes regarding discrepancies in the census data she had sent. They expressed disappointment with the results they were getting and informed her that if the issues did not improve, they would look for another service provider.

McKim met with Yodhes on February 19, 2015 to further discuss her complaints about Miller. Following the meeting, Yodhes emailed McKim to provide him four names—two males and two females—with whom she suggested he speak about poor morale and work overload.

According to Yodhes, male Plan Managers expressed that they felt overloaded with work, and all new Plan Managers, both male and female, were assigned too much work. McKim subsequently emailed Yodhes to tell her that upon concluding his investigation, he did not find any evidence to support her claims. He told her to return if she had any more problems.

On February 20, 2015, another client, Nipro, contacted Yodhes to complain. The client contact complained that employees whose loan repayments had not posted had been reaching out to her. The client stated that she felt like she was "beating a dead horse" and indicated that she may have no choice but to switch from AUL to another vendor. Five days later, the same client emailed Miller to complain about lack of communication from Yodhes.

At some time after Yodhes' meeting with McKim, Miller entered Yodhes' cubicle, sat down on his knees, invaded her personal body space, and started whispering in her ear about a client matter. Yodhes understood this to be odd body behavior intended to intimidate her. Yodhes felt intimidated and humiliated by Miller's conduct. Although, Yodhes stated in an email to a recruiter as part of her effort to find a new job that Miller did not intimidate or frighten her, the truth was that Yodhes was very much intimidated by and afraid of Miller.[4] His behavior impacted her ability to focus and perform her job to her capabilities.

In emails exchanged with Goble between February 20 and 23, 2015, Yodhes complained that her workload was too much for a new person. Goble responded by offering to discuss her workload at their next one-on-one meeting, but Yodhes does not recall if she accepted Goble's offer. Goble also asked Yodhes if she was going to need some help from a coworker to get

---

[4]The Court disagrees with AUL's assertion that these facts contradict Yodhes' deposition testimony; AUL fails to point to any question posed to Yodhes that should have elicited these facts in response.

required testing and contributions work for the MPI Corp. plan done.  Yodhes said yes and Goble complied.

In late February 2015, Yodhes met with Beth Weddell, an AUL human resources employee, to request assistance in dealing with Miller's behavior.  Before Yodhes could finish explaining the situation, Weddell interrupted Yodhes, advised that she did not want to hear anything more about Miller's behavior toward Yodhes, and made a disparaging comment about Yodhes' appearance.  This response by Weddell left Yodhes feeling further humiliated, embarrassed, and afraid.  Yodhes had suicidal thoughts and had to rely on antidepressants.

Because of the recent client complaints, Goble decided to move forward with formal corrective action against Yodhes.  Goble met with McKim in mid-February and commenced preparing a verbal warning, which is the first level of AUL's corrective action process.  The second level is a written warning, which gives the employee additional time to improve.  At 2:29 a.m. on February 24, 2015, Goble emailed a draft of the verbal warning to McKim for his review.  At 9:41 a.m. that same day, nearly seven hours after Goble had emailed the draft to McKim, Goble received an email from Yodhes in which Yodhes disclosed that she would need time off for a medical procedure.

Goble issued the verbal warning to Yodhes on March 2, 2015.  The document detailed a number of complaints about Yodhes' performance received from clients, advisors, and relationship managers, and listed specific areas for improvement over the following sixty days.  Yodhes believes that Goble's impressions of her performance in the verbal warning were mistaken, but not dishonest.  Yodhes was not permitted to work from home after this point.

Yodhes missed work on March 5, 2015, telling Goble that she had pain, a stomachache, a headache, and difficulty sleeping.  Goble told Yodhes that she hoped she felt better, "there's something going around," and that she was home with a sick child that day as well.  Goble also

told Yodhes to turn on her out-of-office greeting and that she did not need to respond to any work emails while she was out sick. That afternoon, a fax from Yodhes' doctor arrived, asking that Yodhes be excused from work that day due to "gyn problems."

That same day, Yodhes emailed McKim to assert that she found the timing of the March 2, 2015, verbal warning suspicious, as she had informed Goble that she needed to have surgery to address her uterine fibroids. She also complained about her workload. In response, McKim assured Yodhes, among other things, that no one wanted her to fail.

On March 6, 2015, Yodhes filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), attempting to allege that AUL had discriminated against her based on her disability and her gender. However, the March 6, 2015 charge reflected only the disability discrimination allegations. Yodhes reached out to the EEOC on several occasions in an effort to correct the error. However, when the omission of her gender discrimination charge had not been remedied by September 2015, Yodhes opted to file a second charge of gender discrimination on September 28, 2015.

At a training session on March 17, 2015, Goble connected her laptop to the projector, after which Yodhes saw the icon for and title of her verbal warning—"Betty Yodhes verbal counseling"—in a listing of other document icons and titles on the large screen for approximately five minutes. Within a very short time after this incident, David Engel, one of the other trainees, severed ties with Yodhes on LinkedIn. Yodhes went to McKim to complain about the breach of confidentiality, and McKim told her that he was certain the display was inadvertent, but he would ask Miller to speak to Goble.

Yodhes requested twelve days off in late March 2015 for a surgical procedure. Although Yodhes was ineligible for FMLA, Goble approved a personal leave of absence from March 18 until March 30, 2015, for Yodhes' surgery. While Yodhes was on leave, she concluded that the

situation at AUL had become unbearable. As a result, she did not return to AUL after her leave. Instead, she quit effective March 30, 2015.

AUL had a comprehensive anti-harassment policy available to all AUL employees that set forth AUL's policy prohibiting harassment and discriminatory conduct, provided instructions for reporting harassment and discriminatory conduct, stated that reports of such conduct will be investigated, and warned that employees who violate the policy will be subject to discipline, up to and including termination.

AUL offered to pay Yodhes' relocation expenses to induce her to accept the position at AUL, and Yodhes accepted. *See* Dkt. No. 10-1. Yodhes received a lump sum payment of $3,000 in accordance with that agreement, and AUL also reimbursed her for expenses she incurred in relocating, for a total of $10,105.08. Yodhes agreed to repay 100% of the relocation expenses if she voluntarily resigned her employment with AUL before completing one year of work. Yodhes has not repaid AUL for any of the relocation benefits. Per the agreement, Yodhes also agreed to repay AUL for its costs, including attorney's fees, incurred in recovering the relocation expenses.

## III.    DISCUSSION

Yodhes filed two charges of discrimination with the Equal Employment Opportunity Commission, one on March 6, 2015, that contained allegations of disability discrimination and another on September 28, 2015, containing allegations of sex discrimination.[5]  In her lawsuit, Yodhes claims that AUL discriminated against her because of her sex and created a hostile work environment. She also claims that AUL discriminated against her based on her disability and

---

[5]AUL contends that Yodhes' sex discrimination, hostile work environment, and sex-based retaliation claims are time barred. *See* Dkt. No. 47 at 12-13, 26. Without addressing AUL's argument, the Court assumes, for purposes of this Entry, that Yodhes' claims are timely brought.

retaliated against her for "expressing her concerns about gender discrimination and for asserting a gender discrimination claim" and also for "seeking accommodations" for her disability. Dkt. No. 1-1 at 7. AUL seeks summary judgment on all of Yodhes' claims. In addition, AUL seeks summary judgment on its breach of contract counterclaim against Yodhes.

### A.    Sexually Hostile Work Environment

"Title VII prohibits the creation of a hostile work environment." *Vance v. Ball State Univ.*, 133 S.Ct. 2434, 2441 (2013). For a work environment to be hostile, "[t]he plaintiff must show that the work environment was so pervaded by discrimination that the terms and conditions of employment were altered." *Id.* To do so requires proof of the following four elements: (1) her work environment must have been subjectively and objectively offensive; (2) her sex must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability, meaning either that a supervisor participated in the harassment or that her employer was negligent in discovering or remedying co-worker harassment. *Liu v. Cook Cty.*, 817 F.3d 307, 318-19 (7th Cir. 2016) (citing *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010)).

Yodhes bases her hostile work environment claim on the fact that "Miller routinely stared at her breasts when he would speak to her," Dkt. No. 51 at 11, and that this conduct "became more pronounced and more frequent in January and into February 2015," *id.* at 4 (citing Dkt. No. 51-1 at 4).[6] In her deposition, she stated that Miller looked at her chest rather than her face

---

[6]The cited evidence does not fully support this claim. In Yodhes' affidavit, she says, "This practice by Miller continued throughout my employment with AUL and even became more pronounced and more frequent in October through January 2015." Dkt. No. 51-1 at 4.

between ten and twenty times from late September 2014 until she left AUL.[7]  Dkt. No. 48-1 at 41.

Here, the facts do not point to an objectively hostile work environment.  *See Hobbs v. City of Chicago*, 573 F.3d 454, 464–65 (7th Cir. 2009).  No reasonable trier of fact could conclude that Miller's behavior, while rude, was sufficiently severe or pervasive to change the conditions of Yodhes' employment.  Rather, Miller's conduct is "more reflective of run of the mill uncouth behavior than an atmosphere permeated with discriminatory ridicule and insult." *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005); *see also Pryor v. Seyfarth, Shaw, Fairweather, & Geraldson*, 212 F.3d 976, 977-78 (7th Cir. 2000) (no "actionable harassment" where male attorney showed female secretary pictures of women in bondage and black leather and asked about her wardrobe on several occasions); *Nuzzi v. Bourbonnais Elementary Sch. Dist.*, 360 Fed. App'x 664, 667 (7th Cir. 2010) ("exaggerated staring . . . , which could be interpreted as sexually motivated, fall[s] far below the severity required for a cognizable sexual harassment claim").  Yodhes' claim, therefore, fails because she has not shown that Miller's conduct created an actionable hostile work environment.[8]

---

[7]In her brief, Yodhes does not address other conduct by Miller or AUL in her discussion of hostile work environment.  As a result, the Court considers only this conduct in evaluating her claim.  *See Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir. 1989) ("A district court need not scour the record to make the case of a party who does nothing."); *see also Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("'It is the parties' responsibility to allege facts and indicate their relevance under the correct legal standard.'") (quoting *Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008)).

[8]Although the Court only discusses conduct Yodhes referred to in the hostile work environment section of her response brief, looking at the totality of the circumstances, a reasonable trier of fact could not conclude that Yodhes was subjected to a hostile work environment based on sex.

## B. Sex Discrimination

Yodhes also brings a claim for disparate treatment because of her sex. She pursues her claim, in part, using the indirect method found in the burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See* Dkt. No. 51 at 9-10. Under the indirect method, to survive AUL's motion for summary judgment, Yodhes must establish that (1) she is a member of a protected class, (2) she was meeting her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) her employer treated similarly situated employees outside the protected class more favorably. *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 853 (7th Cir. 2015) (citing *Bunn v. Khoury Enter., Inc.*, 753 F.3d 676, 685 (7th Cir. 2014)). If a plaintiff establishes her *prima facie* case, the burden shifts to the employer to present a legitimate, non-discriminatory reason for the adverse employment action. *Bunn*, 753 F.3d at 685. On such a showing, the burden then shifts back to the plaintiff to show that the employer's proffered reason is a pretext for discrimination. *Hooper*, 804 F.3d at 853.

Yodhes contends that, although she was not terminated, she was constructively discharged, and that, "[c]onstructive discharge, like actual discharge, is a materially adverse employment action." Dkt. No. 51 at 10. "[C]onstructive discharge occurs when an employer makes an employee's working conditions so intolerable that an employee is forced into involuntary resignation." *Roby v. CWI, Inc.*, 579 F.3d 779, 785 (7th Cir. 2009) (citing *Saxton v. AT & T Co.*, 10 F.3d 526, 536 (7th Cir. 1993)). "Such cases require a plaintiff to show a more egregious situation than a hostile work environment because an employee is normally expected to continue working while seeking redress." *Id.* (citation omitted) (affirming summary judgment for employer where employee presented evidence that supervisor made various inappropriate and sexually-tinged comments, smacked employee's buttocks on one occasion and rubbed his body

against her buttocks on another, which was not evidence "that would lead a reasonable person to believe that she needed to quit her job to protect herself"). Yodhes did not meet the standard for a hostile work environment and cannot meet the more demanding standard of constructive discharge. Yodhes received a leave of absence from AUL for a surgery and decided not to return following the leave. She has not shown that her working conditions were so intolerable that she was forced to resign.

Yodhes also has not shown that AUL treated male employees more favorably than female employees. She argues, generally, that "Miller routinely belittled and demeaned the women in his division and directed angry outbursts at them . . . Miller did not direct such conduct toward the men who reported to him" and that "Miller also made a habit of staring at Yodhes' breasts when he spoke to her. He did not treat men in the office in this manner." Dkt. No. 51 at 10. Aside from these generalized comments, however, Yodhes has not identified any male employee by name at all, let alone any similarly situated male employees, *i.e.*, those about whom clients made similar complaints yet received more favorable treatment than Yodhes received. For these reasons, Yodhes has failed to establish a *prima facie* case of sex discrimination using the indirect method of proof.

Stepping back from the *McDonnell Douglas* burden-shifting framework, "the ultimate question . . . , and that which is relevant here, is 'whether a reasonable jury could find prohibited discrimination.'" *Hooper*, 804 F.3d at 853 (quoting *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014)); *see also Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016) (stating in a national origin discrimination case that the "sole question that matters" is "[w]hether a reasonable juror could conclude that [the plaintiff] would have kept his job if he had a different ethnicity, and everything else had remained the same"). Yodhes has not identified

sufficient factual information that would permit a reasonable jury to find that she was forced to leave her position because of discriminatory animus due to her sex. As a result, she has not met her burden. Accordingly, her sex discrimination claim fails.

## C.    Retaliation

Title VII prohibits employers from retaliating against employees who exercise their rights under the statute. *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010). Like discrimination claims, retaliation claims may proceed under the direct or indirect methods of proof. *Id.* at 690. Yodhes presents her claim of retaliation under the indirect method of proof only. *See* Dkt. No. 51 at 12. To establish a *prima facie* case, the employee must, as a first element, establish that she engaged in a statutorily protected activity. *Turner*, 595 F.3d at 688. Yodhes, however, does not point to any protected activity in her brief. *See* Dkt. No. 51 at 12-13. Instead, she correctly defines the standard used to evaluate a *prima facie* case of retaliation under the indirect method of proof and briefly discusses the other elements of her *prima facie* case. *Id.* The adage that "Judges are not like pigs, hunting for truffles buried in briefs" applies here. *U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Without pointing the Court to any statutorily protected activity, Yodhes cannot establish a *prima facie* case of retaliation under the indirect method of proof.

The Court notes, however, that on February 11, 2015, Yodhes sent an email to McKim, a human resources representative, complaining about Miller.[9] *See* Dkt. No. 48-2 at 20-23. She complained that Miller's "demeanor, threats, and outright mistreatment toward me has created a hostile and intimidating work environment within which it is becoming difficult to perform my

---

[9]Yodhes also filed a charge of discrimination with the EEOC on March 6, 2015, which is clearly protected activity. That charge, however, did not allege discrimination on the basis of sex and therefore cannot support Yodhes' retaliation claim under Title VII.

daily functions," *id.* at 20, and that she felt that Miller was "singling [her] out and retaliating against [her] for his own shortcomings in the area of managerial experience," *id.* at 21. She also stated that "[i]n [her] own observations and conversations with co-workers in the past four months and also based on my own college background in psychology, it is evident that [Miller] has difficulty maintaining good work communication relations with women." *Id.* She further complained that Miller "was hurling unfounded accusations to hurt my feelings with regards to my national origin." *Id.* at 22. She reiterated that she felt she was experiencing "retaliation from [her] superior for making him look bad and embarrassing him," *id.* at 23, and stated that she could "only conclude [she was] being discriminated against, treated as a scapegoat and singled out," *id.*

Although it is unclear from Yodhes' email whether she was complaining that Miller's behavior toward her was because of her sex, the Court assumes, for purposes of this Entry, that she was and that she, therefore, engaged in statutorily protected activity. Nonetheless, she has not presented sufficient evidence to establish a *prima facie* case of retaliation under the indirect method of proof.

As the Court has already explained, Yodhes has not met the demanding standard to show that she was constructively discharged. That is, she has not shown that her working conditions were so intolerable that she was forced to resign. She also has not shown that she was treated less favorably than a similarly situated employee who did not engage in protected activity. *South v. Ill. Envtl. Prot. Agency*, 495 F.3d 747, 753 (7th Cir. 2007) (affirming summary judgment for employer on retaliation claim where employee did not show, among other things, that other employees were outside the protected class); *see also Burks v. Wisc. Dep't of Transp.*, 464 F.3d 744, 759 (7th Cir. 2006) (affirming summary judgment for employer where employee did not

point to similarly situated employee who had not engaged in protected activity).  For these reasons, her *prima facie* case of retaliation fails.

Stepping outside the indirect method framework, Yodhes has not otherwise made an argument or attempted to show a causal link between her protected activity and her failure to return to work following her leave.  *See Lauth v. Covance, Inc.*, 863 F.3d 708, 716-717 (7th Cir. 2017) (evaluating retaliation claim outside of the *McDonnell Douglas* burden-shifting framework and focusing on "whether there is a causal link between [the protected activity and adverse action]").  Because she fails to point to any evidence from which a jury could conclude that she was constructively discharged because of her protected activity, her retaliation claim again fails.

### D.    ADA Claims

The Court understands Yodhes to allege three separate claims under the ADA: a failure to accommodate claim, a disparate treatment claim, and a retaliation claim for opposing disability discrimination.  The entirety of Yodhes' briefing regarding her ADA claims follows:

> AUL argues that Yodhes cannot state a prima facie case for gender [sic] discrimination because she cannot show that AUL knew about her condition or that AUL failed to provide reasonable accommodations.  However, as noted above, Yodhes did disclose her condition to Goble in January and February 2015.

> As AUL notes in its summary judgment brief, Yodhes can establish discrimination through either disparate treatment or failure to accommodate.  Here, Yodhes has identified instances of both.  As noted above, once AUL was aware of her condition and the resulting doctors' appointments and eventual surgery, AUL provided Yodhes with a corrective action plan, and Miller continued to treat Yodhes in a hostile, harassing manner.  With respect to accommodations, Yodhes requested that she be permitted to work from home on a regular basis when her pain level was elevated.  AUL declined this request.

Dkt. No. 51 at 13.

Yodhes' briefing falls far short of the type of cogent argument this Court is entitled to expect from counsel.  While Yodhes lists actions that she considers adverse, she has not pointed

the Court to evidence that would permit a reasonable factfinder to conclude that her disability caused the adverse actions; nor has she even attempted to articulate why she believes that AUL took any actions on account of her disability. While she also indicates that she requested and was denied the ability to work from home, she does not attempt to articulate how this satisfies the elements of a failure to accommodate claim under the ADA. In addition, she does not mention a possible retaliation claim under the ADA or any basis for it.

The Court will not make a party's arguments for her, nor will it assemble the evidence necessary to support her position. *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir. 2004) ("[W]e will not root through the hundreds of documents and thousands of pages that make up the record here to make his case for him."); *Herman*, 870 F.2d at 404 ("A district court need not scour the record to make the case of a party who does nothing."). Courts are entitled to assistance from counsel: "An advocate's job is to make it easy for the court to rule in his client's favor." *Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 613 (7th Cir. 2006). When counsel presents the Court with limited argument unsupported by any record evidence or case law, "[the] court need not make the lawyer's case." *Diadenko v. Folino*, 741 F.3d 751, 757 (7th Cir. 2013) (quoting *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) (internal citation omitted)). Doing so would impose an extraordinary burden on the Court's limited resources. Of aid to the Court would have been a cogent, well-organized argument properly supported by record evidence and legal authority that responded to the issues raised by AUL. Without developed arguments and evidence to support them, Yodhes' ADA claims fail.

### E. Breach of Contract Counterclaim

AUL seeks summary judgment in its favor on its breach of contract counterclaim. Yodhes signed a "Relocation Expense Reimbursement Policy" ("Agreement") that "if, at any

time during the two (2) years following my date of employment with AUL, I leave AUL's employment or am terminated for Cause** from AUL . . . , I will repay to AUL a pro-rated amount of the payments made by AUL at any time during my first two (2) years of employment according to the schedule located below." Dkt. No. 10-1. For "12 full months or less of service," the Agreement required "100% repayment of relocation expenses." *Id.* The Agreement further stated that "If AUL incurs legal costs to collect any amount due from me, I agree to pay those costs, including attorney's fees." *Id.*

Yodhes contends that she was constructively discharged from her employment and "[a]s a result, under the terms of the parties' agreement, [her] obligation to repay relocation expenses was never triggered." Dkt. No. 51 at 13-14. She makes no other arguments related to AUL's counterclaim.

AUL argues that there is no genuine issue of material fact regarding whether Yodhes breached the Agreement or AUL suffered damages as a result of the breach. Dkt. No. 47 at 35. AUL claims that it "suffered $10,105.08 in damages from the payments it made to secure Yodhes' relocation, plus its attorney's fees associated with recovering those damages as required in the Agreement." *Id.* It also notes that Yodhes admits that she has not repaid AUL. *Id.* For these reasons, AUL believes it is entitled to summary judgment on its counterclaim.

The Court agrees. As already explained, Yodhes has not met the demanding standard to establish that she was constructively discharged from her employment at AUL. Rather, she voluntarily terminated her employment less than a year after she began working at AUL. As a result, Yodhes agreed to "100% repayment of relocation expenses" and "legal costs to collect any amount due" under the Agreement, including attorney's fees. Dkt. No. 10-1. Accordingly, AUL is entitled to summary judgment on its counterclaim.

# IV.   CONCLUSION

For the reasons set forth above, the Court **GRANTS** summary judgment in favor of Defendant American United Life Insurance Company on all of Plaintiff Betty Yodhes' claims against it and as to liability on its counterclaim against Yodhes.

On the Court's own motion, the Final Pretrial Conference set for May 10, 2018, at 10:00 a.m. in Room 202 and the Jury Trial set for June 11, 2018, at 9:00 a.m. in Room 202 are hereby **VACATED,** to be reset at a later date, if necessary.  The parties shall confer and file **within 14 days of the date of this Entry** notice of how they would like to proceed in this case. Specifically, the Court seeks to know whether the parties believe a trial is necessary on the issue of damages related to AUL's counterclaim.  The Court encourages counsel to contact the Magistrate Judge assigned to this matter to request a settlement conference if they believe it would be beneficial.

SO ORDERED: 4/16/18

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification